IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Criminal Case No. DKC 03-321-1 |
| | : |
| DEONE ANTONIO MELVIN | : |
| | : |

**MEMORANDUM OPINION**

Deone Antonio Melvin was convicted after a jury trial in 2005, of Counts 1 and 5 of the superseding indictment and Counts 3, 6, 7 and 8 of the second superseding indictment. He was sentenced by Judge Alexander Williams to a total of 540 months (45 years), consisting of 180 months concurrent on Count 1 (conspiracy to distribute 5 kilograms or more of cocaine), Count 3 (money laundering conspiracy), Count 5 (distribution of cocaine), and Count 8 (felon in possession of a firearm), followed by consecutive sentences of 5 years on Count 6 (possession of a firearm in furtherance of drug trafficking), and 25 years on Count 7 (possession of a firearm in furtherance of drug trafficking). (ECF No. 497). President Barack Obama later commuted the overall sentence to 360 months, undifferentiated as to counts. (ECF No. 809). He has filed a motion for a reduced sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (ECF No. 885).

Mr. Melvin seeks to reduce his sentence to "time served," arguing that this relief is warranted for compassionate relief reasons. The Government opposes any relief.

## Motion for Compassionate Release

Ordinarily, "[t]he court may not modify a term of imprisonment once it has been imposed[.]" 18 U.S.C. § 3582(c) (2018). This general rule is subject to certain exceptions, including the compassionate release provision, which allows the BOP to seek a modification of a prisoner's sentence. *See id.* § 3582(c)(1)(A). Under the First Step Act of 2018, the compassionate release provision was modified to allow prisoners to seek a sentencing reduction directly from the court. The provision now provides, in relevant part, that:

> The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

2

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

On December 2, 2020, the United States Court of Appeals for the Fourth Circuit ruled, in *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), that a district court is empowered, under 18 U.S.C. § 3582(c)(1)(A), to consider any extraordinary and compelling reason that a defendant might raise, and specifically that district courts did not err in considering that mandatory consecutive stacked sentences for violations of 18 U.S.C. § 924(c), that would not be imposed under current law, resulted in sentences that exceeded those necessary to achieve the ends of justice.

**Discussion**

The facts as recounted in the Fourth Circuit opinion are as follows:

> Some time in 1997, Shahid Omar, who was running a drug distribution operation in Maryland, began to obtain cocaine in New York from Francisco Despiau. Despiau was a drug trafficker, with several sources of supply. He also outfitted vehicles with hidden compartments to help facilitate the transportation of drugs. Over time, Despiau sold several vehicles

outfitted with hidden compartments to both Omar and Mason.

Despiau's first transaction with Omar involved two kilograms of cocaine. Thereafter, Omar made trips to New York every five to six days, purchasing on average between three and five kilograms of cocaine. On some of these trips, Omar was accompanied by Mason. On one occasion, Mason, accompanied by Jones, went to New York to retrieve from Despiau approximately $35,000, which was previously left as a deposit for cocaine that ultimately could not be obtained at that time. Mason and Jones were unsuccessful on this trip, but Mason returned to New York a few days later and retrieved the money.

Once the cocaine arrived in Maryland, Omar sold it to several customers, including Mason. Mason in turn had customers of his own, including Aaron Harrod. Harrod met Mason in 1999 and began purchasing cocaine from him. During one of these transactions, Mason brought Omar along with him. At the meeting, Harrod and Omar recognized each other, as they attended high school together. Based on this earlier acquaintance with Omar, Harrod began purchasing cocaine directly from Omar to avoid paying the middleman's premium charged by Mason.

On September 4, 1999, Harrod met Omar to consummate a three kilogram transaction. Harrod approached Omar's vehicle and handed Mason, who was a passenger in the vehicle, $66,000. Moments later, Omar shot Harrod seven to eight times, wounding him. Omar was arrested and detained for the shooting. Thereafter, Mason attempted to get $25,000 from Despiau to give to Harrod in exchange for Harrod's promise not to testify against Omar. When Despiau asked Mason what he would do if Harrod testified, Mason responded that he would "do" Harrod to prevent him from testifying. Harrod eventually received $25,000 and signed an affidavit stating that Omar did not shoot him. At Omar's trial, however, Harrod testified truthfully.

While Omar was incarcerated, Mason forged a direct relationship with Despiau. For his first transaction with Despiau, Mason traveled to New York with Jones and purchased 400 grams of cocaine. Thereafter, Mason purchased larger quantities of cocaine. For each of these transactions, Mason paid

4

Omar a fee because Omar was responsible for finding Despiau as a source of cocaine.

In April 2000, law enforcement officers searched Mason's blue Ford Windstar. In the hidden compartment under the rear seat, the officers found a cache of weapons, including the gun that Omar had used to shoot Harrod. Following this search, Mason was arrested and incarcerated. As a result, Mason gave **Melvin** and Jones permission to contact Despiau, so that they could obtain cocaine from Despiau while Mason was incarcerated.

While Mason was incarcerated, **Melvin** and Jones traveled regularly, by themselves and with others, to buy cocaine from Despiau. On average, **Melvin** and/or Jones picked up approximately ten kilograms of cocaine per week. On one occasion, they purchased approximately thirty kilograms of cocaine. **Melvin** and Jones also obtained from Despiau numerous vehicles containing hidden compartments. Most if not all of the vehicles were placed in names other than those of the true users.

**Melvin** and Jones were assisted by drivers who picked up cocaine from, and delivered drug money to, Despiau. **Melvin** used Alexander as a driver, while Jones used Bennie Wilder.

In letters that Mason wrote to **Melvin** and Jones from jail, Mason insisted that **Melvin** and Jones pay him a fee every time they obtained cocaine from Despiau. In the late summer of 2002, Mason was released from jail and immediately began to purchase cocaine from Despiau. Between the summer of 2002 and the spring of 2003, **Melvin**, Mason, and Jones together distributed at least eighty kilograms of cocaine.

Mason distributed some cocaine and cocaine base (crack) that he prepared in a microwave to Brian Elzey. Wilder also purchased cocaine from Mason in order to "cook" it into crack for resale.

By the spring and summer of 2003, Jones and Mason ran up such huge debts—Jones owing as much as $100,000, while Mason owed approximately $40,000—that Despiau cut off their supply of cocaine and sought to collect the money owed to him from prior deals. Melvin, Jones, Mason, and Alexander became increasingly frustrated by

5

their inability to get more cocaine from Despiau and looked for alternate sources of supply.

During the summer of 2003, the Drug Enforcement Administration (DEA) intercepted conversations occurring over telephones utilized by Mason and **Melvin**, including numerous conversations concerning the sale and purchase of cocaine. **Melvin** and Alexander were overheard discussing which vehicles with hidden compartments should be taken to New York for the purpose of bringing back cocaine and strategies for avoiding police detection during these trips. **Melvin**, Jones, Mason, Alexander, and others discussed how they could pay off the debts owed to Despiau and how soon thereafter they would be able to get more cocaine. **Melvin** and Jones discussed an incident in which Alexander had fled from police after being stopped because he had a gun in the glove compartment. Alexander, in another intercepted call, described an incident in which he was shot at and had to go to his vehicle to retrieve a gun and return fire. Other intercepted conversations concerned weapons and the titling of vehicles and assets in the names of other persons, including Audrey Melvin (Deone Melvin's mother) and Derrick Tobias.

At the culmination of the investigation, on July 31, 2003, **Melvin**, Jones, and Mason were arrested, along with other codefendants. Law enforcement officers also executed search warrants at multiple locations. The officers found a Glock .45 caliber pistol in **Melvin's** bedroom at the apartment he shared with Jones in Upper Marlboro, Maryland. During wiretapped calls, **Melvin** and Jones discussed placing guns at the home of Dana Dark at 4310 Lavender Lane in Bowie, Maryland, because of their concerns that law enforcement might search their apartment. At the Lavender Lane location, the officers recovered a Ruger 9 mm pistol, a Heckler & Koch .40 caliber pistol, an Intratec 9 mm pistol, and a Masterpiece Arms .45 caliber pistol.

In an area of Audrey Melvin's home utilized by Deone **Melvin**, agents found a rifle, a digital scale with cocaine residue, a Pyrex dish with crack residue, and other materials used for the packaging and cooking of cocaine, as well as a money counter. Upon his arrest, **Melvin** voluntarily waived his Miranda rights and agreed to be interviewed by law enforcement officers.

6

>       At Mason's home at 415 Aragona Drive in Fort Washington, Maryland, law enforcement officers recovered a .38 caliber revolver with an obliterated serial number. In the hidden compartment of the blue Ford Explorer parked at the home, the officers found approximately 125 grams of cocaine and a Heckler & Koch .45 caliber pistol.
>
>       In December 2003, law enforcement officers located Alexander at his girlfriend's home. In a Chevrolet Tahoe registered to Alexander's brother, but used by Alexander, the officers found a Heckler & Koch .40 caliber handgun.

*United States v. Melvin*, No. 05-4997, 2007 WL 2046735, at *1–3 (4th Cir. July 13, 2007). The guidelines on the non-924(c) counts were 360 months to life (based on more than 150 kilograms of cocaine and a four-level leadership enhancement, criminal history II), with a then mandatory 30 years to follow (5 years on the first § 924(c) count, and 25 years on the second). As noted at the outset, Judge Williams sentenced him to 45 years, not the 60 years that the Government sought.

   Mr. Melvin claims that the sentence he is serving results from two stacked § 924(c) sentences. While that was true, at least in part, prior to the commutation, it no longer is. His sentence is an undifferentiated 360 months for the six offenses for which he was convicted. Those include conspiracy and distribution of cocaine, money laundering conspiracy, felon in possession of a firearm, and two counts of possession of a firearm in furtherance of drug trafficking.

   The Government disputes whether Mr. Melvin has established grounds for compassionate release. It asserts that under

guidelines of today, the advisory sentencing range would be 32 to 38 years of imprisonment.  It points out that the initial sentence was variant, and much lower than the guidelines on the non-924(c) counts and that the 15-year commutation further blunts the effect of the old stacking law.  It reports that Judge Williams considered Mr. Melvin to be the most culpable of the four defendants who went to trial and that Mr. Mason got a longer sentence only because his criminal history required imposition of a life sentence.

The court agrees with the Government that, with the 15-year reduction due to executive clemency, there is no force to a disparate sentence argument based on the initial stacked § 924(c) sentences.  First, Judge Williams sentenced him well under the guidelines for the non-924(c) offenses in light of the 30-year sentences he was obliged to impose on the § 924(c) counts.  Second, President Obama reduced the sentence another 15 years.  It is no longer true that his sentence is at all dictated by the now abandoned approach to § 924(c) sentences.  He was not found guilty of distributing crack cocaine, so his guidelines and sentence had nothing to do with that issue.  Rather, he brazenly trafficked in at least 150 kilograms of cocaine, possessed or controlled numerous firearms, and played the most significant leadership role.  Thus, the length of the sentence does not constitute an extraordinary circumstance.  Nor do the other purported bases satisfy the threshold either.  He tries to argue that other aspects of the guidelines or sentencing would be different, such as a departure

in criminal history category or the granting of a larger variance. Such tinkering at the edges of a sentence are not the type of extraordinary and compelling circumstances necessary for compassionate release. Nor is there anything to his contention that his sentence is disparate when compared to co-defendants, particularly given Judge Williams' view of his relative role. Nor is his so called "remarkable" rehabilitation significant enough to justify relief. He is to be lauded for being infraction free, for participating in vocational and educational programs, other workshops, and working consistently, and for forging and maintaining strong family relationships. Even when considered in combination, however, those circumstances do not cross the threshold for compassionate release.

While it is not necessary to discuss the § 3553(a) factors, the court remarks that it nevertheless would not impose a lesser sentence even were the issue open. The shear quantity and scope of this trafficking, the presence of guns, the violence by some, and the very, very late acceptance of responsibility amply justify the 30-year sentence he is serving, even when considered in light of the potentially mitigating circumstances asserted. The motion will be denied.

A separate order will follow.

                                          /s/
                                    DEBORAH K. CHASANOW
                                    United States District Judge